Alexander M. Schack, Esq. (CA Bar No. 99126)
Natasha N. Serino, Esq. (CA Bar No. 284711)
Shannon F. Nocon, Esq. (CA Bar No. 316523)
**SCHACK LAW GROUP**
16870 West Bernardo Drive, Suite 400
San Diego, CA  92127
Tel: (858) 485-6535 Fax: (858) 485-0608
alexschack@schacklawgroup.com
natashaserino@schacklawgroup.com
shannonnocon@schacklawgroup.com

Derek Gilliland, Esq. (TX Bar No. 24007239)
R. Daniel Sorey, Esq. (TX Bar No. 24041957)
John Hull, Esq. (TX Bar No. 24050791)
**SORREY, GILLILAND & HULL, LLP**
109 W. Tyler St.
Longview, TX 75601
Tel: (903) 212-2822  Fax: (903) 212-2864
Derek@SoreyLaw.com
Dan@SoreyLaw.com
John@SoreyLaw.com
*Pro Hac Vice* **Applications to be Filed**

Timothy Micah Dortch, Esq. (TX Bar No. 24044981)
**POTTS LAW FIRM**
2911 Turtle Creek Blvd., #1000
Dallas, TX 75219
Tel: (214) 396-9429
mdortch@potts-law.com
*Pro Hac Vice* **Application to be Filed**

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

- 1 -

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

| | |
|---|---|
| RONNIE DILLARD, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>INVITRX THERAPEUTICS, INC. and HABIB TORFI, and Does 1-10, Inclusive<br><br>                    Defendants. | Case No. _____<br><br>**COMPLAINT**<br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Ronnie Dillard ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Invitrx Therapeutics, Inc., Habib Torfi ("Torfi"), and Does 1 - 10 (collectively "Defendants" or "Invitrx"). Plaintiff's allegations are based upon personal knowledge, the investigation of counsel, and information and belief.

### I.    INTRODUCTION

1.    Plaintiff brings this action on behalf of himself and other similarly situated consumers against Defendants Invitrx and Torfi (collectively "Invitrx" or "Defendants"). This case arises from Invitrx's scheme to improperly promote, market, and sell stem cell related products from their Irvine, California headquarters to consumers nationwide. Plaintiff is one such consumer who paid for Invitrx's stem cell based products that were admittedly adulterated with contaminants such as Hepatitis B and potentially other contaminants.

2.    Invitrx's customers are typically sick, disabled, and severely impaired individuals for whom conventional medicine and medical procedures offer little or no hope. Invitrx preyed and continues to prey upon these unsuspecting individuals by

touting its products as nothing less than "breakthrough technologies" that "have led to the creation of numerous life-changing cell therapy products." *See* https://Invitrx.com, last accessed March 22, 2020. For example only, Invitrx touts its Invitra cord-blood stem cell ("CBSC") products as having amazing properties to "self-renew, release growth factors, and further develop into more specialized cells." *See* https://Invitrx.com/invitra-cbsc/ last accessed March 22, 2020.

## Primary Characteristics

Stem cells were first identified in cord blood over 40 years ago. Since then cord blood has been used routinely for hematopoietic stem cell transplantation. Cord blood contains a mixed population of cells, including hematopoietic stem cells (HSC) and mesenchymal stems cells (MSC). These cells have the capacity to self-renew, release growth factors, and further develop into more specialized cells. These cells have also been associated with contributing to tissue homeostasis, anti-inflammatory responses and antioxidant effects.

3.     In addition to touting the alleged near-miraculous properties of its products, Invitrx also provides detailed "Quality Assurance" of its CBSC products.

## Quality Assurance

Invitra CBSC™ is processed from donated umbilical cords from full term deliveries. All donors are pre-screened and undergo comprehensive testing that includes:

- Behavioral risk assessment
- Physical assessment
- Donor medical history
- Communicable disease testing

Infectious disease testing is performed at a certified laboratory in accordance with the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493.

4.     These and similar statements regarding the quality and safety of Invitrx's products were contained not only on the website, but also in the package material,

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

package inserts, and marketing material that accompanied Invitrx CBSC products as sold to physician's and used on consumers such as Plaintiff. In short, at all relevant times, Invitrx represented and warranted to consumers that their products were safe and certified clean from communicable diseases, infectious diseases, had been tested in a certified laboratory according to federal law and regulation, were otherwise fit for their ordinary uses, and were otherwise manufactured and distributed in accordance with applicable laws and regulations.

5.     On information and belief, however, Plaintiff contends that Invitrx knew its processing and testing operations were inadequate and that Invitrx willfully ignored warning signs regarding its operating standards and source products.

6.     These short-comings in Invitrx's screening, testing, and processing resulted in adulterated CBSCs being sold and distributed across the United States despite being adulterated by communicable and infectious diseases such as Hepatitis B. Such adulterated stem cells were sold and distributed across the United States where they were injected by unsuspecting doctors into unsuspecting patients.

7.     Eventually, Invitrx recalled—either voluntarily or at the urging of the United States government—some of the adulterated products by one or more letters dated on or around April 11, 2019. Plaintiff was the recipient and victim of an injection of one such potentially adulterated and recalled lot of CBSCs. Plaintiff further believes that Invitrx has sold many more contaminated products and has done so for a longer period of time than its recall suggests.

## II.    PARTIES

8.     Plaintiff Ronnie Dillard is a Texas resident. During the class period, he paid for one or more of Invitrx's CBSC products to be injected into his body. Invitrx expressly and impliedly warranted to Plaintiff and Plaintiff's physician that Invitrx's CBSC and other stem cell products were safe, sterile, and had been tested for a variety of communicable and infectious diseases including Hepatitis B. Yet after

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1  Plaintiff's injections, he and his physician received correspondence from Invitrx

2  stating that its products had in fact been infected with Hepatitis B and that Plaintiff

3  needed to be tested for the disease. Had Invitrx's deception about the impurities

4  within and cleanliness of its products been made known earlier, Plaintiff would not

5  have paid for or allowed his doctor to inject him with Invitrx's products.

6      9.    Defendant Invitrx Therapeutics Inc. ("Invitrx") is a Delaware

7  corporation with its principal place of business located at 400 Spectrum Center Dr.,

8  Suite 1560, Irvine, CA 92618. At all times material to this case, Invitrx has been

9  engaged in the manufacturing, sale, and distribution of stem cell products throughout

10 the United States, including in California. Invitrx may be served with process by

11 serving its registered agent, Joshua H. Abel, at 2601 Main Street, Suite 1200, Irvine,

12 California 92614.

13     10.    Defendant Habib Torfi is an individual residing and working in

14 California. He may be served with process at his place of business, 400 Spectrum

15 Center Dr., Suite 1560, Irvine, CA 92618, or anywhere he may be found.

16     11.    The true names and capacities of defendants DOES 1 through 10,

17 whether individual, corporate, associate, representative, are unknown to Plaintiff who

18 therefore sues said defendants by such fictitious names. Plaintiff will amend this

19 Complaint to allege the true names and capacities of DOES 1 through 10 when

20 Plaintiff has such information. Plaintiff is informed and believes and thereon alleges

21 that each of the fictitiously named defendants is responsible in some manner for the

22 occurrences and damages alleged herein.

23     12.    Plaintiff is informed and believes and thereon alleges that, at all times

24 mentioned, each defendant, including DOES 1 through 10, was the agent,

25 representative, alter ego, successor-in-interest, affiliate, principal, partner, joint

26 venture, co-conspirator, and/or employee of the other defendants, and was acting

27 within the course and scope of their agency and employment. As such, each

28

- 5 -

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

defendant was acting within the course and scope of its authority and with the express
and/or implied permission, knowledge, consent, and ratification of all other
defendants when doing the acts and omissions alleged herein.

### III.    JURISDICTION AND VENUE

13.    This Court has original jurisdiction pursuant to the Class Action
Fairness Act, 28 U.S.C. § 1332(d), because on information and belief (a) at least one
member of the proposed class is a citizen of a state different from that of Invitrx, (b)
the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the
proposed class consists of more than 100 class members, and (d) none of the
exceptions under the subsection apply to this action. In addition, this Court has
original jurisdiction pursuant to 28 U.S.C. § 1331.

14.    Additionally, this Court has diversity jurisdiction over this case under 28
U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and because
Plaintiff and Invitrx are citizens of different states.

15.    This Court has personal jurisdiction over Invitrx because Invitrx has
sufficient minimum contacts in California, and otherwise intentionally avails itself of
the markets within California through its business activities, such that the exercise of
jurisdiction by this Court is proper and necessary.

16.    Venue is proper in this District because: Invitrx resides in this District,
28 U.S.C. § 1391(b)(1); because "a substantial part of the events or omissions giving
rise to the claim occurred" in this District, 28 U.S.C. § 1391(b)(2); and because
Defendants are subject to the personal jurisdiction of this Court, 28 U.S.C. §
1391(b)(3).

### IV.    ALTER EGO

17.    Plaintiff alleges that Defendant Invitrx was at all times relevant the alter
ego of Defendant Habib Torfi.

18.    Plaintiff contends that Defendant Habib Torfi at all relevant times

- 6 -

dominated, influenced, and controlled Defendant Invitrx, its officers, its businesses, its properties, and its affairs. On filings with the California Secretary of State, Defendant Torfi is identified as the Chief Executive Officer, Secretary, and Chief Financial Officer of Defendant Invitrx. On its website, Defendant Invitrx describes Defendant Torfi as the "Founder, Chairman and CEO." Defendant Torfi is described as "[a] licensed clinical scientist in the state of California, Mr. Torfi holds an undergraduate degree in Microbiology and a graduate degree in Human Genetics. He has also published numerous papers and holds several patents in the stem cell and bioengineering field." https://invitrx.com/team-member/habib-torfi/, last accessed March 23, 2020. Despite these statements, a search of the U.S. Patent and Trademark Offices database of issued patents and patent applications reveals that Defendant Torfi appears as a named an inventor on two patent applications that have been abandoned and he does not appear as a named inventor on any issued patents.

19.   Plaintiff contends that all time relevant there existed and continues to exist a unity of interest and ownership between Defendant Torfi and Defendant Invitrx such that the individuality and separateness of each Defendant has ceased to and no longer exists.

20.   Plaintiff further contends that since the formation of Defendant Invitrx, they have been and are now a mere shell and naked framework that acts as a conduit for the conduct of their individual and personal business, property, and affairs.

21.   Plaintiff further contends that at all times relevant, Defendant Invitrx was created and continued to further a fraudulent plan, scheme, and device conceived and operated by Defendant Torfi where income, revenue, and profits of Defendant Invitrx were diverted to Defendant Torfi.

22.   Plaintiff further contends that Defendant Invitrx was formed for the purpose of allowing Defendant Torfi to insulate himself from and avoid personal liability and    substitute    financially    irresponsible    and    potentially    insolvent

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

corporations in place of Defendant Torfi.

23.    On information and belief, Plaintiff contends that Defendant Invitrx was formed with completely inadequate capitalization for the business in which Defendant Invitrx was and is engaged.

24.    Plaintiff contends that adherence to the corporate fiction of Defendant Invitrx would sanction a fraud and promote injustice in that Plaintiff and members of the proposed class would be unable to realize compensation for their injuries or any judgment in their favor.

## V.    FACTUAL ALLEGATIONS

### A.    *Invitrx Background*

25.    Defendant Invitrx claims that it was founded by Defendant Torfi in 2003.

> Invitrx was founded by Habib Torfi in 2003 following extensive research and clinical trials utilizing adult stem cell technology to treat patients suffering from burns, diabetic ulcers, ocular surface disorders, and other ophthalmic conditions. Today we're widely regarded as one of the world's leading stem cell technology companies.

https://invitrx.com/about-us/, last accessed March 23, 2020.

26.    Filings by Defendant Invitrx with the California Secretary of State and with the Delaware Secretary of state indicate Defendant Invitrx was first incorporated in 2009.

27.    Defendant Invitrx was incorporated by non-physician Defendant Torfi as a way to make money off stem cells. Defendant Invitrx generates profits by selling stem cell treatments such as Invitra CBSC, Invitra Amniotic Tissue and Amniotic Fluid, and Invitrx WJ-C, which are all products derived from the fluids, tissues, and cells generated during a human pregnancy. Additionally, Defendant Invitrx sells a line of over-the-counter cosmetics under the name trade name ReLuma. Defendant

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1    Invitrx makes fantastic claims about the benefits of its ReLuma line of products,

2    which are based on what Defendant Invitrx calls its "Stem Cell Core Technology." It

3    sells these ReLuma cosmetic products for up to $242.00 for a single fluid ounce.



https://invitrx.com/reluma/, last visited March 23, 2020.

https://reluma.com/, last visited March 23, 2020.

28.    For the creation of its Invitra CBSC, Defendant Invitrx begins with human umbilical cord blood. Defendant Invitrx claims that it performs minimal manipulation on the tissues, but still claims to comprehensively screen and test donors and their cells for communicable and infectious diseases without impairing the stem cells alleged "capacity to self-renew, release growth factors, and further develop into more specialized cells." All of this is done through an allegedly "proprietary process to preserve the tissue characteristics and properties." https://invitrx.com/invitra-cbsc/  and https://invitrx.com/our-process-lab/, last visited

- 9 -

1    on March 23, 2020.

2    **_B._**        **_Background on Current Good Tissue Practices_**

3        29.    Federal law regulates the manufacture and distribution of products

4    containing human tissues. If the tissue meets very specific requirements, it can be

5    regulated under the Current Good Tissue Practices ("CGTP") of Title 21 Code of

6    Federal Regulations, Part 1271, Subparts D and E. 21 C.F.R. Part 1271. The

7    regulation attempts to "prevent the introduction, transmission, and spread of

8    communicable diseases by" human cells, tissues, or cellular or tissue-based products

9    ("HCT/Ps"). 21 C.F.R. § 1271.1(a). By meeting specific requirements or by falling

10   within one of the exceptions, HCT/Ps can be regulated solely by the CGTP

11   regulations. 21 C.F.R. § 1271.10(a), 1271.15.  If a substance does not meet the strict

12   requirements of part 1271.10(a) or an exception under part 1271.15, then it is

13   regulated "as a drug, device, and/or biological product" under additional and stricter

14   regulations. _See_ 21 C.F.R. § 1271.20.

15       30.    These stricter regulations are codified, at least in part, in Title 21 Code

16   of Federal Regulations 210 and 211. These are known and titled as the Current Good

17   Manufacturing Practice ("CGMP"). The CGMP apply to any human cells, tissues,

18   and cellular and tissue-based products ("HCT/Ps") that are not subject to regulation

19   solely under Title 21 Code of Federal Regulation 1271. That means if an HCT/Ps

20   does not satisfy the requirements of 21 C.F.R. § 1271.10(a) or satisfy the exemptions

21   under 21 C.F.R. § 1271.10, the products "will be regulated as a drug, device, and/or

22   biological product under the act and/or section 351 of the PHS Act, and applicable

23   regulations in title 21, chapter I. Applicable regulations include, but are not limited

24   to, §§207.9(a)(5), 210.1(c), 210.2, 211.1(b), 807.20(d), and 820.1(a) of this chapter,

25   which require you to follow the procedures in subparts C and D of this part." 21

26   C.F.R. § 1271.20.

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

_C._        **_Invitrx Has Never Complied With Federal Regulations_**

31.    Invitrx sells several products based on stem cells and human tissues. Invitra CBSC is a "human tissue allograft suspension derived from umbilical cord blood." https://invitrx.com/invitra-cbsc/_._ Invitra AT (Amniotic Tissue) and Invitra AF (Amniotic Fluid) are a "a biological acellular product derived from human amnion." https://invitrx.com/invitra-at-af/. Invitrx WJ-C is a "human tissue allograft suspension derived from the Wharton's Jelly of the umbilical cord."  https://invitrx.com/invitra-wj-c/. Even Invitrx's ReLuma's products are made "with growth factors and matrix proteins derived through the application of Stem Cell Core Technology." https://invitrx.com/reluma/. Despite these products involving human cells and tissues—and an obvious intention for them to be used by consumers—nowhere does Invitrx claim to have satisfied any federal premarket approvals or complied with federal CGTPs and CGMPs.

32.    The only reference anywhere on Invitrx's public facing website that references federal regulation is a statement that "[i]nfectious disease testing is performed at a certified laboratory in accordance with the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493." https://invitrx.com/invitra-cbsc/. CLIA and 42 C.F.R. part 493 do not address the manufacture or sell of products containing human cells or tissues. Rather CLIA and 42 C.F.R. part 493 "set forth the conditions that all laboratories must meet to be certified _to perform testing_ on human specimens under the Clinical Laboratory Improvement Amendments of 1988 (CLIA)." 24 C.F.R. § 493.1 (emphasis added). Nothing about the regulation that Invitrx claimed to comply with addresses the safety or efficacy of products manufactured and sold by Invitrx.

_D._        **_Invitrx Should Have Been Aware of Potential Hepatitis B Contamination As Early As 2016_**

33.    Creation of the Current Good Tissue Practices ("CGTP") regulations

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

began decades ago. The regulatory structure was described by the FDA at least as early as 2001. 66 Fed. Reg. 5447 (Jan. 19, 2001). The regulatory structure was created to put in place "a comprehensive new system of regulation for human cells, tissues, and cellular and tissue-based products." *Id*. Those regulations created a set of rules requiring registration of human cellular and tissue-based products, a set of rules establishing donor suitability, and a set of rules establishing the "Current Good Tissue Practice for Manufacturers." *Id*. at 5447-5448. While many of the rules became final in 2001, the rules governing Current Good Tissue Practices were finalized and adopted on November 24, 2004. *See* 69 Fed. Reg. 68681 (Nov. 24, 2004). In the legal authority cited in the passage of those regulations, the government noted that "[s]ection 361 of the PHS Act authorizes the FDA to issue regulations necessary to prevent the introduction, transmission, or spread of communicable diseases." 69 Fed. Reg. 68613 (Nov. 24, 2004). The legal authority went on to note that "Certain diseases, such as those caused by the human immunodeficiency virus (HIV) and the *hepatitis B* and C viruses (HBV and HCV respectively), may be transmitted through the implantation, transplantation, infusion, or transfer of HCT/Ps derived from infected donors." *Id*. (emphasis added) For that reason, the final regulations required manufacturers to follow Current Good Tissue Practices "to prevent the introduction, transmission, or spread of communicable diseases by HCT/Ps (e.g., by ensuring that the HCT/Ps do not contain communicable disease agents, that they are not contaminated, and that they do not become contaminated during manufacturing)." 21 C.F.R. 1271.150(a). If Invitrx did not already know otherwise, by simply reviewing the federal regulations governing the manufacture of human cell, tissue, and cellular and tissue-based products, Invitrx would have known that regulations needed to be followed to prevent the spread of communicable diseases such as Hepatitis B.

34.    In fact, the FDA published additional guidance for manufacturers on the

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

best practices for avoiding contamination by communicable diseases. In August of 2016, the FDA published its guidance titled, "Use of Nucleic Acid Tests to Reduce the Risk of Transmission of Hepatitis B Virus from Donors of Human Cells, Tissues, and Cellular and Tissue-Based Products: Guidance for Industry." *See* **Exhibit 1**. That document—which built upon prior FDA testing guidance—stated that use of FDA-licensed nucleic acid tests should be used to screen for the hepatitis B virus. That guidance said, "[w]e consider the use of FDA-licensed HBV [hepatitis b virus] NAT [nucleic acid test] in testing HCT/P donors **to be necessary to adequately and appropriately reduce the risk of transmission of HBV**. The FDA-licensed HBV NAT can detect evidence of the viral infection at an earlier stage than the hepatitis B surface antigen (HBsAg) and total antibody to hepatitis B core antigen (anti-HBc) tests." *Id*. So by August of 2016, Invitrx should have known that nucleic acid testing of samples was necessary to adequately screen core blood cells for hepatitis B.

### E.    *The FDA Identified Problems at Invitrx in 2016*

35.     In September of 2016, the FDA inspected Invitrx's manufacturing facility, which at that time was located at 27 Mauchly, Suite 200, Irvine, California 92618. *See* **Exhibit 2**. The FDA focused on Invitrx's ReLuma cosmetic products and took several samples. Even at that time, Invitrx was cited for violating the Federal Food, Drug and Cosmetic Act by claiming that the products could cure or treat myriad human ailments. Those claims confirmed that Invitrx's products were subject to significant regulation that had to be satisfied before Invitrx could sell its products. This letter clearly highlighted how federal regulation applied to the ReLuma products and should have made it clear to Defendants that their stem cell products were subject to similar extensive regulation—including identifying specific statutory provisions that Invitrx should have been aware of.

36.     More ominously, however, the FDA inspection also identified deficiencies in Invitrx's manufacturing process. The FDA noted "that adipose derived

stem cells, dermal fibroblasts, and human cord blood, intended for use for research purposes, are used in the manufacturing of Human Adipose Derived Stem Cell Conditioned Media (HADSCM) for your ReLuma [products]." *See Id*. at 3-4 The FDA was concerned about this observation because the use of these cells—including human cord blood—created a "potential for viral or microbial contamination." This was especially concerning because, "we do not have any evidence that a validated viral inactivation/removal process or some other appropriate process is being used during the manufacturing process and the source of the human cells used to manufacture the materials is unknown." In short, the FDA called Invitrx's attention to the very problem that lead to the recall letter Plaintiff received—Invitrx's testing for viruses such as hepatitis B was inadequate or completely absent.

37.    As noted above, this was around the same time the FDA published its guidance that nucleic acid testing was the better test and was "necessary to adequately and appropriately reduce the risk of transmission of HBV [hepatitis b virus]." As we know now, Invitrx failed to heed any of this advice.

### F.    *Invitrx Announces a "Voluntary Recall" of Its Adulterated Invitrx CBSC*

38.    Not long after Invitrx was reprimanded by the FDA, Plaintiff met with a health care provider to explore possible stem cell injections. Plaintiff suffered severe knee pain in both knees and had been led to believe that stem cell injections offered the possibility of relief.

39.    Plaintiff sought the type of relief that Invitrx touted in its brochures and on its website when it said, "These cells have the capacity to self-renew, release growth factors, and further develop into more specialized cells. These cells have also been associated with contributing to tissue homeostasis, *anti-inflammatory responses* and antioxidant effects. This collection of cells can work together to provide a synergistic effect to *offset the naturally occurring processes that typically derive from*

- 14 -

*age* and environmental factors." *See* **Exhibit 3**.

40.    On or around September 25, 2018, Plaintiff had both of his knees injected with 2 cc's of Invitrx CBSC products—a decision he would regret just a few months later.

41.    On or around May 7, 2019, Plaintiff was informed that the injections he received came from a group of stem cells that Invitrx had recalled. The recall notice, dated April 11, 2019, stated that Invitrx was "voluntarily recalling 24 lots Invitrx CBSC (cord blood stem cells) due to possible contamination with Hepatitis B." *See* **Exhibit 4**.

42.    Notably, the letter from Invitrx states that "The donor of the umbilical cord blood that was used to produce theses [sic] lots of product tested positive for Hepatitis B core antibody (though the donor tested negative for Hepatitis B surface antigen)." *Id*. This indicates that Invitrx had ignored the FDA guidance recommending the use of nucleic acid tests that could "detect evidence of the viral infection at an earlier stage than the hepatitis B surface antigen (HBsAg) and total antibody to hepatitis B core antigen (anti-HBc) tests." *See* **EXHIBIT 1**. Invitrx's focus on the tests of the donor rather than the tissue also indicate that it failed to follow the FDA's previous warning that should have a viral inactivation or removal process or "perform viral or microbial testing on harvested conditioned media." *See* **Exhibit 2**. Apparently, Invitrx wholly ignored these prior warnings and guidance from the FDA.

G.    ***Invitrx's Warranties and Fraudulent and Deceptive Statements to Consumers***

43.    At all times relevant to this case, Invitrx made affirmative statements regarding the safety and quality of its products, including its CBSC products. For example, in 2017 when Invitrx advertised its products, including Invitra CBSC, as

injectable treatment for people suffering from knee and joint pain, it also emphasized that quality "assurance standards are rigorously maintained" and that it verified "sterility through utilization of microbial testing." *See* **Exhibit 5**. More recently, Invitrx has emphasized the safety of its CBSC products by a quality assurance statement as follows:



Quality Assurance

Invitra CBSC™ is processed from donated umbilical cords from full term deliveries. All donors are Pre-screened and undergo comprehensive testing that includes:

• Behavioral risk assessment
• Physical assessment
• Donor medical history
• Communicable disease testing

Infectious disease testing is performed at a certified laboratory in accordance with the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493.

**Exhibit 3**.

44.    Even today, Invitrx continues to assert these claims of rigorous testing to prevent communicable and infectious diseases.



# Quality Assurance

Invitra CBSC™ is processed from donated umbilical cords from full term deliveries. All donors are pre-screened and undergo comprehensive testing that includes:

• Behavioral risk assessment
• Physical assessment
• Donor medical history
• Communicable disease testing

Infectious disease testing is performed at a certified laboratory in accordance with the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*See* https://invitrx.com/invitra-cbsc/, last visited March 25, 2020.

45.     On information and belief, at all times relevant, Invitrx failed to properly screen, test, and treat its products, including the Invitra CBSC products, for communicable and infectious diseases such as hepatitis B. These statements were made with full knowledge of the FDA recommendations and guidance, but with apparent conscious disregard for the safety and welfare of the consumers.

## VI.    The FDA Finally Cracked Down on Invitrx

46.     In 2019, the FDA conducted another inspection of Invitrx's manufacturing facilities. These inspections took place in March and April of 2019. They culminated in a warning letter, Warning Letter #OBPO 20-581182, being sent to Invitrx on March 16, 2020. *See* **Exhibit 6**.

47.     The inspection was important because as the FDA said, Invitrx's "products are intended for injection and are purported to be sterile." The products the FDA was referring to included all of Invitrx's stem cell products—Invitra CBSC, Invitra WJ, Invitra AF, and Invitra AT. The FDA noted that all of those products are drugs under the Federal Food, Drug and Cosmetics Act and biologics under the Public Health Safety Act and are subject to strict federal regulation—in addition to regulation under 21 C.F.R. part 1271. The FDA went on to document several ways in which Invitrx failed to comply with federal law, including the following:

48.     Violations of 21 C.F.R. 1271.50(a) for failing to document or to review medical records to determine if donors were eligible;

49.     Violations of 21 C.F.R. 1271.80(d)(1) for failing to determine a donor to be ineligible when the donor's test was reactive on a screening test for communicable diseases—the specific disease at issue being hepatitis B;

50.     Violations of 21 C.F.R. 1271.75(a) for failing to review donor medical records to screen for risk factors or clinical evidence of communicable diseases;

- 17 -

51.     Violations of 21 C.F.R. 1271.47(a) for failing to establish and maintain procedures for determining donor eligibility to adequately reduce the risk of transmission of communicable diseases;

52.     Violations of 21 C.F.R. 1271.55(a) for failing to retain records regarding donor eligibility;

53.     Violations of 21 C.F.R. 211.113(b) for failing to establish and follow written procedures to prevent microbiological contamination of products purporting to be sterile;

54.     Violations of 21 C.F.R. 211.165(f) for failing to reject products that do not meet established standards such as failing to reject products that has microbial growth or positive tests for gram positive cocci;

55.     Violations of 21 C.F.R. 211.67(b) for failing to establish and follow written procedures for cleaning and maintaining equipment;

56.     Violations of 21 C.F.R. 211.192 for failing to thoroughly investigate unexplained discrepancies or failures of sterility tests;

57.     Violations of 21 C.F.R. 211.100(a) for failing to establish written procedures for production and process controls and to ensure products have the qualities they are represented to have;

58.     Violations of 21 C.F.R. 211.42(c)(5) failing to have separate defined areas to prevent cross-contamination during manufacturing or processing;

59.     Violations of 21 C.F.R. 211.42(c)(10(iv) for failing to have a system to monitor the environment or personnel in an aseptic processing area;

60.     Violations of 21 C.F.R. 211.76 for failing to test products for the presence of penicillin after having been exposed to cross contamination from penicillin;

61.     Violations of 21 C.F.R. 211.198(a) for failing to establish and follow written procedures to document and investigate product complaints;

- 18 -

62.     Violations of 21 C.F.R. 211.166(a) for failing to test the stability of products and develop appropriate storage conditions and expiration dates;

63.     Violations of 21 C.F.R. 211.125(f) for failing to establish written procedures to control labeling; and

64.     Violations of 21 C.F.R. 211.84(a) for failing to withhold containers and components from use until they have been adequately tested or examined.

65.     These violations identified by the FDA highlight the indifference and disregard Invitrx has displayed toward its product consumer such as Plaintiff and the Class Members.

### VII.    Fraudulent Concealment and Tolling

66.     Plaintiff's and Class Members' causes of action accrued no earlier than the date Invitrx sent letters voluntarily recalling its Invitrx CBSC products.

67.     Alternatively, any statute of limitation or prescriptive period is equitably tolled on account of fraudulent concealment. Invitrx affirmatively concealed from Plaintiff and other Class Members their unlawful conduct. Invitrx affirmatively strove to avoid disclosing their knowledge of product contamination, CGMP violations, and CGTP violations

68.     Because of this, Plaintiff and other Class Members did not discover, nor would they discover through reasonable and ordinarily diligence, Invitrx's deceptive, fraudulent, and unlawful conduct alleged herein. Invitrx's false and misleading explanations, or obfuscations, lulled Plaintiff and Class Members into believing that the prices paid for Invitrx products such as Invitra CBSC, Invitra Amniotic Tissue and Amniotic Fluid, and Invitrx WJ-C, were appropriate for what they believed to be properly screened, sterilized, and/or non-adulterated products despite their exercise of reasonable and ordinary diligence.

69.     As a result of each Invitrx's affirmative and other acts of concealment, any applicable statute of limitations affecting the rights of Plaintiff and other Class

Members has been tolled. Plaintiff and/or other Class Members exercised reasonable diligence by among other things promptly investigating and bringing the allegations contained herein. Despite these or other efforts, Plaintiff was unable to discover, and could not have discovered, the unlawful conduct alleged herein at the time it occurred or at an earlier time so as to enable this complaint to be filed sooner.

## VIII.   CLASS ACTION ALLEGATIONS

70.   Plaintiff brings this action both individually and as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

71.   The Class that Plaintiff seeks to represent is defined as follows:

(a)   All individuals in the United States of America and its territories and possessions who, since at least January 1, 2011, paid any amount of money out of pocket for Invitrx's stem-cell based products, including Invitra CBSC, Invitra Amniotic Tissue and Amniotic Fluid, and Invitrx WJ-C, that were or might have been adulterated with communicable or infectious diseases such as, but not limited to, Hepatitis B.

72.   Excluded from the Class are: (a) any Judge or Magistrate presiding over this action, and members of their families; (b) Defendants and affiliated entities, and their employees, officers, directors, and agents; (c) Defendants' legal representatives, assigns and successors; and (d) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

73.   Plaintiff reserves the right to narrow or expand the foregoing class definition, or to create subclasses as the Court deems necessary.

74.   Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the Class.

75.   **Numerosity**: While the exact number of Class Members cannot be determined without discovery, they are believed to consist of potentially hundreds or thousands of consumers nationwide of Invitrx's Invitra CBSC. The Class Members

1  are therefore so numerous that joinder of all members is impracticable.

2      76.    **Commonality**: Common questions of law and fact exist as to all Class

3  Members and predominate over any questions that affect only individual members of

4  the class. This case is based primarily on Invitrx's claims of safety and efficacy of its

5  products, especially Invitra CBSC via its primary point of contact with consumers

6  and physicians—its website, https://Invitrx.com. The false and misleading statements

7  contained on Invitrx's website include but are not limited to the following:

8      77.    Whether Invitrx made express or implied warranties of "cleanliness" and

9  "sterility" to Plaintiff and Class Members regarding their stem cell products;

10     78.    Whether Invitrx properly screened and/or performed comprehensive

11 testing of stem cell donors for communicable or infectious diseases;

12     79.    Whether Invitrx properly screened and/or performed comprehensive

13 testing of stem cell tissues for communicable or infectious diseases;

14     80.    Whether Invitrx made express or implied warranties that its Invitra

15 CBSC products were free from communicable or infectious diseases, such as hepatitis

16 B;

17     81.    Whether Invitrx affirmatively misrepresented or omitted facts regarding

18 its compliance with CGTPS, and/or was not adulterated;

19     82.    Whether Invitrx affirmatively misrepresented or omitted facts regarding

20 its compliance with the Clinical Laboratory Improvement Amendments of 1988

21 (CLIA) and 42 CFR part 493;

22     83.    Whether Plaintiff and other Class Members have been injured as a result

23 of each Invitrx's unlawful conduct, and the amount of damages;

24     84.    Whether a common damages model can calculate damages on a class-

25 wide basis;

26     85.    When Plaintiff's and Class Members' causes of action accrued;

27     86.    Whether Invitrx fraudulently concealed Plaintiff's and Class Members'

28

causes of action.

87.    **Typicality**: Plaintiff' claims are typical of Class Members' claims. Plaintiff and Class Members all suffered the same type of economic harm. They all purchased Invitrx's Invitra CBSC products believing them to be effective and safe for use only to discover they contained a risk of communicable or infectious diseases. They all had to pay for additional testing, and in some cases, treatment to determine whether they had Hepatitis B or any other infectious disease identified by Invitrx. Plaintiff has the same interest in this matter as all other Class Members and their claims arise out of the same set of facts and conduct.

88.    **Adequacy of Representation**: Plaintiff is committed to pursuing this action and has retained competent counsel experienced in pharmaceutical litigation, consumer fraud litigation, class action, and federal court litigation. Accordingly, Plaintiff and his counsel will fairly and adequately protect the interests of Class Members. Plaintiff's claims are coincident with, and not antagonistic to, those of the other Class Members he seeks to represent. Plaintiff has no disabling conflicts with Class Members and will fairly and adequately represent the interests of Class Members.

89.    The elements of Rule 23(b)(2) are met. Defendants have acted on grounds that apply generally to Class Members so that preliminary and/or final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

90.    **Superiority:** The elements of Rule 23(b)(3) are met. Here, the common questions of law and fact enumerated above predominate over the questions affecting only individual Class Members, and a class action is the superior method for fair and efficient adjudication of the controversy. Although many other Class Members have claims against Invitrx, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such

litigation. Serial adjudication in numerous venues is furthermore not efficient, timely or proper. Judicial resources will be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of thousands of claimants in one suit would be impractical or impossible. In addition, individualized rulings and judgments could result in inconsistent relief for similarly situated Plaintiffs. Plaintiff's counsel, highly experienced in pharmaceutical litigation, consumer fraud litigation, class actions, and federal court litigation, foresees little difficulty in the management of this case as a class action.

## FIRST CAUSE OF ACTION:  BREACH OF EXPRESS WARRANTIES
### (INDIVIDUALLY AND ON BEHALF OF THE CLASS)

91.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

92.    Invitrx expressly warranted that its stem cell products were fit for their ordinary use, by affirmatively asserting that Invitrx had a quality assurance program to perform comprehensive testing of donors and tissues for communicable and infectious diseases and by affirmatively asserting they could be injected in patients to treat a myriad of problems including degenerative joint problems such as those suffered by Plaintiff.

93.    At all times relevant California had adopted provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose. *See* Cal. Com. Code § 2313

94.    At the time that Invitrx marketed and sold its stem cell products, it recognized the purposes for which the products would be used, and expressly warranted the products were CGMP and/or CGTP compliant and/or not adulterated. These affirmative representations became part of the basis of the bargain in every purchase by Plaintiff and other Class Members.

95.    Invitrx breached its express warranties with respect to its  product as it

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

was not of merchantable quality, was not fit for its ordinary purpose, and did not comply with CGMP, CGTP, and/or was adulterated.

96.    As a direct and proximate result of Invitrx's breach of its express warranty, Plaintiff and other Class Members have been injured and suffered damages, in that Invitrx's products they purchased were so inherently flawed, unfit, or unmerchantable as to have essentially zero, significantly diminished, or no intrinsic market value. In addition, Class Members such as Plaintiff who purchased or were treated with Invitrx's products that were potentially adulterated with hepatitis B, suffered additional injuries of mental anguish associated with concerns of having contracted hepatitis B, possibly infecting loved ones with hepatitis B, having to pay for and undergo testing for hepatitis B, in some instances having to pay for an undergo treatment for hepatitis B, and in some instances having to live with chronic hepatitis B acquired from Invitrx's contaminated products.

**SECOND CAUSE OF ACTION: BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS (INDIVIDUALLY AND ON BEHALF OF THE CLASS)**

97.    Plaintiff re-allege and incorporate the preceding paragraphs as if fully set forth herein.

98.    At all times relevant, the State of California had codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose. Cal. Com. Code § 2314.

99.    Invitrx was a merchant within the meaning of the above statute.

100.    Invitrx's product constituted "goods" or the equivalent within the meaning of the above statute.

101.    Invitrx was obligated to provide Plaintiff and other Class Members a reasonably fit product for the purpose for which the product was sold, and to conform to the standards of the trade in which Invitrx is involved such that the product was of

fit and merchantable quality.

102.   Invitrx knew or should have known that its product was being manufactured and sold for the intended purpose of human injection as a therapeutic, and impliedly warranted that same was of merchantable quality and fit for that purpose.

103.   Invitrx breached its implied warranty because Invitrx's products were not of merchantable quality, nor fit for the product's ordinary purpose, and did not conform to the standards generally applicable to such goods.

104.   As a direct and proximate result of Invitrx's breach of implied warranty, Plaintiff and other Class Members have been injured and suffered damages, in that Invitrx's stem cell products they purchased was so inherently flawed, unfit, or unmerchantable as to have essentially zero, significantly diminished, or no intrinsic market value. In addition, Class Members such as Plaintiff who purchased or were treated with Invitrx's products that were potentially adulterated with hepatitis B, suffered additional injuries of mental anguish associated with concerns of having contracted hepatitis B, possibly infecting loved ones with hepatitis B, having to pay for and undergo testing for hepatitis B, in some instances having to pay for an undergo treatment for hepatitis B, and in some instances having to live with chronic hepatitis B acquired from Invitrx's contaminated products.

### THIRD CAUSE OF ACTION:  FRAUD
### (INDIVIDUALLY AND ON BEHALF OF THE CLASS)

105.   Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

106.   Invitrx affirmatively misrepresented material facts including, *inter alia*, that its products complied with CGMPs, CGTP, were not adulterated, and/or had not been comprehensively tested or treated to prevent communicable or infectious diseases.

- 25 -

107. Invitrx failed to disclose material facts to render non-misleading its statements about, *inter alia*, that its products did not comply with CGMPs, CGTP, were adulterated, and/or had not been comprehensively tested or treated to prevent communicable or infectious diseases.

108. Invitrx's actions had the effect of fraudulently inducing customers to pay in whole or in part for Invitrx's products—products that Invitrx knew or should have known did not comply with CGMPs, CGTP, were adulterated, and/or had not been comprehensively tested or treated to prevent communicable or infectious diseases. Plaintiff and other Class Members would not have paid some or all of the amounts they paid for Invitrx's stem cell products had they known the truth. Plaintiff and other Class Member also would not have had to get tested for hepatitis B, worry about whether they had contracted or transmitted hepatitis B to a loved one, get treated for hepatitis B, or cope with chronic hepatitis B.

109. Invitrx knew, or reasonably should have known, that their misrepresentations were materially false or misleading, or that the omission of material facts rendered such representations false or misleading.

110. Invitrx also knew, or had reason to know, that their misrepresentations and omissions would induce Plaintiff and Class Members to pay for some or all of the cost of Invitrx's products. Invitrx's misrepresentations and omissions were material.

111. To the extent applicable, Invitrx intended its misrepresentations and omissions to induce Plaintiff and other Class Members to pay for Invitrx's products.

112. But for these misrepresentations and omissions, Plaintiff and other Class Members would not have paid for Invitrx's products.

113. To the extent applicable, Plaintiff and other Class Members were justified in relying on Invitrx's misrepresentations and omissions. The same or substantively identical misrepresentations and omissions were communicated, to each Class Member, including through Invitrx's public website, its product labeling, and other

- 26 -

statements by Invitrx. No reasonable consumer would have paid what they did for Invitrx's products but-for Invitrx's unlawful conduct. To the extent applicable, reliance may be presumed in these circumstances.

114.    Plaintiff and other Class Members were damaged by reason of Invitrx's misrepresentations and omissions alleged herein.

### FOURTH CAUSE OF ACTION:  VIOLATION OF CAL. CIV. CODE § 1750, *et seq.*

### (INDIVIDUALLY AND ON BEHALF OF THE CLASS)

115.    Plaintiff incorporates the preceding paragraphs as if restated fully herein.

116.    Plaintiff brings this cause of action on behalf of himself and the Class Members under the California Civil Code, section 1750, *et seq*.

117.    Invitrx's conduct constitutes unfair, unlawful, and fraudulent business acts or practices because Invitrx's conduct has caused and is likely to cause substantial injury to Plaintiff and the Class Members. Such injuries are not reasonably avoidable by Plaintiff or the Class Members because Invitrx has superior and exclusive knowledge about the truth of its stem cell products—including the conditions of its donors, the manufacturing and production processes, the testing and sterilization processes, the labeling an marketing process, and the ultimately sterility and safety of its stem cell products. Despite this level of knowledge, Invitrx concealed, misrepresented, and omitted the truth from its website, marketing, and product information literature.

118.    Invitrx's conduct described in this Complaint is unlawful and violates the Consumer Legal Remedies Act, California Civil Code section 1750, *et seq*. Invitrx's conduct complained of in this Complaint violates multiple provisions of the Consumers Legal Remedies Act, including without limitation sections 1770(a)(2), (a)(5), and (a)(7).

119.    Invitrx's conduct is fraudulent in that is has deceived or is likely to

deceive Plaintiff, the Class Members, and the public. Invitrx sold Plaintiff and the Class Members Invitrx stem cell products. Plaintiff contends that Invitrx made such false and misleading statements and omissions to induce reliance and encourage payments, either in full or as a deposit for Invitrx's stem cell products.

120.    Additionally, Invitrx's fraudulent conduct—both by affirmative statements and by omission of facts known only to Invitrx—caused Plaintiff and other Class Members to have to undergo testing for hepatitis B, and if such tests were positive, undergo treatment for, and if not treatable, live with chronic hepatitis B.

121.    Plaintiff and the Class Members would not have paid for Invitrx's stem cell products, made deposits for Invitrx's stem cell products, or undergone testing and treatment for hepatitis B if not for Invitrx's fraudulent and misleading statements and omissions.

122.    Plaintiff seeks certification of a class under California Civil Codes § 1781.

123.    In this complaint, Plaintiff seeks his attorneys' fees and injunctive relief under California Civil Code §§ 1780 and 1782(d) enjoining Defendants continued production, manufacture, and sell of its stem cell based products, including but not limited to Invitra CBSC and that Defendant immediately recall all outstanding or previously sold stem cell based products, including but not limited to Invitra CBSC for failure to comply with federal regulations.

124.    Pursuant to California Civil Code § 1782(a), on March 30, 2020, Plaintiff on behalf of himself and other similarly situated consumers sent a certified letter, through his counsel, to Defendants notifying Defendants of their violations of the CLRA with respect to its manufacture, marketing, and sale of Invitrx products and requesting that Defendants cease and desists their unlawful conduct, identify and give notice to affected consumers and offer to make appropriate restitution, correct or other remedy to consumers. If Defendants fail to provide appropriate relief for its

violations of the CLRA within 30 days of the date of the notification letter, Plaintiff will amend this Complaint pursuant to section 1782(d) to seek actual statutory and punitive damages in addition to equitable relief. Plaintiff is currently only seeking equitable relief under this cause of action.

### FIFTH CAUSE OF ACTION: VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200, *et seq*.
### (INDIVIDUALLY AND ON BEHALF OF THE CLASS)

125.    Plaintiff bring this count on behalf of themselves and the Class, pursuant to California Business and Professions Code, §17200, et seq.

126.    Invitrx's conduct constitutes unfair, unlawful and fraudulent business acts and/or practices because Invitrx's practices have caused and are likely to cause substantial injury to Plaintiff and Class Members, which injury is not reasonably avoidable by Plaintiff and Class Members because of Invitrx's exclusive knowledge of the truth about its stem cell products, including but not limited to Invitra CBSC, Invitra Amniotic Tissue and Amniotic Fluid, and Invitrx WJ-C, the cleanliness and potential communicable diseases in its stem cell based products, though it misrepresented, concealed and omitted these truths.

127.    Invitrx's acts and practices are unlawful because they violate, among other laws, the Consumer Legal Remedies Act, Civil Code § 1750 et seq., Bus. & Prof. Code § 17500, as alleged in this Complaint and incorporated here by reference.

128.    Invitrx's acts and practices are fraudulent in that they have deceived and/or are "likely to deceive" Plaintiff, the proposed Class Members, and members of the public. Invitrx sold Plaintiff and Class Members stem cell based products and/or induced them to make deposit payments for such treatments, for which Invitrx made false and misleading statements, and omitted material information, in order to induce reliance and encourage deposits and purchases by Plaintiffs and members of the Class.

129.    Invitrx was obliged to disclose the material facts because: a) it had exclusive knowledge of the material facts not known to Plaintiff and Class Members, since only Invitrx had access to data about the source of its stem cell tissues and the operations of its processing and manufacturing facilities; b) Invitrx actively concealed and suppressed the material facts from Plaintiff and Class Members in regard to the true facts available on those subjects; (c) Invitrx knew or should have known that its products posed safety and health risks; and (d) Plaintiff and the purchasing public could not have reasonably been expected to learn or discover that Invitrx's products posed dangerous health and safety risks.

130.    The injury to consumers is substantial, particularly due to the significant cost of Invitrx's stem cell based products, including but not limited to Invitra CBSC. Plaintiff and Class Members paid thousands of dollars for treatments with Invitrx's stem cell based products that they would not otherwise have spent, had they known the truth about the potential for contamination, the lack of federal approval, and Invitrx's failure to comply with federal regulations concerning the proper screening of donors and the processing, treatment, and testing of tissues used to make stem cell based products.

131.    The injury to consumers is not outweighed by any countervailing benefits to consumers or competition. Any purported benefits to consumers are negated by consumers' interests in knowing the true facts regarding services offered for purchase, particularly medical or pseudo-medical treatments they are purchasing at substantial cost. Consumers have an important interest in being informed of this information in order to make an intelligent and informed decision about whether to purchase the service.

132.    The injury to consumers is not an injury that consumers themselves could reasonably have avoided because consumers did not know the true facts regarding Invitrx's stem cell based products and had no reason to believe that

Invitrx's statements were false, misleading, or omitted material information.

133.    Invitrx's acts and practices offend established public policy and are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.

134.    Plaintiff and others similarly situated, were misled by Invitrx's material misrepresentations into believing that Invitrx had properly screened tissue donors and had properly processed, treated, and tested its stem cell based products to eliminate communicable and infectious diseases and to ensure the products complied with all federal regulations.

135.    Plaintiff and Class Members reasonably relied on Invitrx unfair, unlawful and fraudulent conduct with regard to material misrepresentations and omissions regarding testing, processing, and manufacture of its stem cell based products and would not have purchased the stem cell based products had Invitrx provided truthful information about it's screening, testing, processing, and manufacture of its stem cell based products.

136.    Invitrx's conduct caused Plaintiff's and Class Members' injuries because they would not have purchased or even been able to purchase Invitrx stem cell based products, would have paid less for them, or would not have paid deposits for them, had Invitrx conducted itself fairly during the transactions.

137.    Invitrx's unfair, unlawful, and fraudulent business acts and practices directly and proximately caused Plaintiff's and Class Members' injuries as complained of in this complaint. Invitrx's material omissions and misrepresentations have a tendency to deceive a significant portion of the consuming public and/or of targeted consumers.

138.    Plaintiff and Class Members seek an order of this Court awarding restitution of all payments made to Defendants for Stem Cell Treatments, injunctive relief and all other relief allowed under California Business and Professions Codes §

17200, et seq., plus interest, attorneys' fees, and costs.

**SIXTH CAUSE OF ACTION: VIOLATIONS OF CAL. BUS. & PROF. CODE § 17500, *et seq.***
**(INDIVIDUALLY AND ON BEHALF OF THE CLASS)**

139.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

140.    Plaintiff brings this action on behalf of himself and Class Members under California Business and Professions Code section 17500, *et seq*.

141.    Invitrx is a "person" as defined by the California Business and Professions Code. Cal. Bus. & Prof. Code § 17506.

142.    As described throughout this Complaint, Invitrx falsely advertised its stem cell products by making partial, false, and materially misleading statements or representations about its stem cell products, while omitting material information. Invitrx's advertising has deceived and is likely to deceive Plaintiff and the Class Members.

143.    Plaintiff and Class Members relied on Invitrx's false advertising to their detriment when they paid for or paid deposits for Invitrx's stem cell products. Plaintiff and Class Members would not have paid such sums but for Invitrx's failure to disclose material information about its stem cell products. Thus Invitrx's conduct as described in this Complaint proximately caused Plaintiff's and the Class Members' injuries for which they seek recovery herein.

**SEVENTH CAUSE OF ACTION: NEGLIGENCE**
**(INDIVIDUALY AND ON BEHALF OF THE CLASS)**

144.    Invitrx owed a duty to Plaintiff and the Class to use and exercise reasonable and due care in the manufacturing of its products.

145.    Invitrx owed a duty to Plaintiff and the Class to ensure that the products it sold in the United States complied with CGMP, CGTP, were not adulterated, and/or did not contain communicable or infectious diseases.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

146.    Invitrx owed a duty of care to Plaintiff and the Class because they were the foreseeable, reasonable, and probable user of product and victim of each of Invitrx's fraudulent and deceptive activities. Invitrx knew, or should have known, that its products did not comply with CGMP, CGTP, were adulterated, and/or contained communicable or infectious diseases, and Invitrx was in the best position to uncover and remedy these shortcomings.

147.    Invitrx failed to do this. Invitrx inadequately oversaw the manufacture and sale of its products. Invitrx knew that ignoring the manufacturing issues surrounding its products would damage Plaintiff and the Class and increase Invitrx's profits.

148.    Invitrx maintained or should have maintained a special relationship with Plaintiff and the Class, as they were obligated to ensure that its products complied with CGMP, CGTP, were not adulterated, and/or did not contain communicable or infectious diseases.

149.    Invitrx's own actions and inactions created a foreseeable risk of harm to Plaintiff and the Class. Invitrx's misconduct included, but was not limited to, failing to oversee actions taken in the manufacture and sale of its product.

150.    Invitrx breached the duties owed to Plaintiff and the Class by failing to exercise reasonable care sufficient to protect the interests and meet the needs of Plaintiff and the Class.

151.    As a direct and proximate result of Invitrx's negligent conduct, Plaintiff and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

**A.**    ***Negligence Per Se***

152.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

153.    Invitrx owed a duty to Plaintiff and the Class to use and exercise

- 33 -

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

reasonable and due care in the manufacturing of its products.

154.    Invitrx owed a duty to Plaintiff and the Class to ensure that the products it sold in the United States complied with CGTP, were not adulterated, and/or contained no communicable or infectious diseases.

155.    Invitrx owed a duty to Plaintiff and the Class because each State, territory, and possession has adopted and/or adheres to federal CGTP and adulteration standards.

156.    Invitrx failed to comply with federal CGTP, and/or federal adulteration standards.

157.    As a result of each of Invitrx's failures to do so, Invitrx's own actions and inactions created a foreseeable risk of harm to Plaintiff and the Class.

158.    As a direct and proximate result of Invitrx's negligent conduct, Plaintiff and the Class have suffered injuries and are entitled to damages in an amount to be proven at trial.

## IX.    JURY DEMAND

159.    Plaintiff respectfully request a trial by jury on all causes of action so triable.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1.    That this case be certified as a class action under the Federal Rules of Civil Procedure;

2.    An Order appointing Plaintiff as Class Representative;

3.    An Order appointing undersigned counsel as Class Counsel to represent the Class;

4.    A Declaration that Defendants are liable pursuant to each and every one of the above-enumerated causes of action;

- 34 -

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

5.    That Plaintiff be allowed a jury trial on behalf of himself and the Class, and a jury trial is hereby demanded;

6.    That under the CLRA, UCL, and False Advertising Law, all Defendants, their officers, directors, principals, assignees, successors, agents, representatives, employees, subsidiaries, affiliates, and all persons, corporations and other entities acting by, through and under them, be permanently enjoined from directly or indirectly making any illegal, untrue, or misleading statements in violation of the CLRA, Business and Professions Code §§ 17200, *et seq.*, and 17500, *et seq.*, including but not limited to the untrue or misleading statements alleged in this Complaint;

7.    An Order awarding appropriate preliminary and/or final injunctive relief against the conduct of Defendants described herein;

8.    Payment to Plaintiff and Class Members of all damages, exemplary or punitive damages, and/or restitution associated with the conduct for all causes of action in an amount to be proven at trial;

9.    An award of attorneys' fees, expert witness' fees, and costs, as provided by applicable law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on Plaintiff and the Class Members;

10.   An award of statutory penalties to the full extent available;

11.   Interest as provided by law, including but not limited to, pre-judgment and post-judgment interest as provided by rule or statute; and

12.   Such other and further relief as this Court may deem just, equitable, or proper

Dated:  March _30, 2020                                Respectfully submitted,
                                                       SCHACK LAW GROUP

                                                       /s/ Natasha N. Serino
                                                       Natasha N. Serino

- 35 -

Derek Gilliland
R. Daniel Sorey
John Hull
SOREY, GILLILAND & HULL, LLP
109 W. Tyler
Longview, TX 75601
Telephone: (903) 212-2822
Facsimile: (903) 212-2864
Pro Hac to be Filed

Timothy Micah Dortch
POTTS LAW FIRM, LLP
2911 Turtle Creek Blvd., Ste. 1000
Dallas, Texas  75219
Telephone:  (214) 396-9427
Pro Hac to be Filed

Alexander M. Schack, Esq.,
Bar No. 99126
Natasha N. Serino, Esq.,
Bar No. 284711
Shannon F. Nocon, Esq.,
Bar No. 316523
SCHACK LAW GROUP
16870 West Bernardo Drive,
Suite 400
San Diego, CA  92127
Tel: (858) 485-6535
Fax: (858) 485-0608
alexschack@schacklawgroup.com
natashaserino@schacklawgroup.com
shannonnocon@schacklawgroup.com

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL